UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>    v.<br><br>RODGER GITHENS,<br><br>            Defendant. | No.  1:23-cr-00089-NODJ BAM<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND REQUEST FOR A *FRANKS* EVIDENTIARY HEARING<br><br>(Doc. 41) |

    Rodger Githens is charged with receiving or distributing child pornography. Law enforcement officers discovered this evidence while executing a search warrant at his home related to a different suspected crime. Githens now argues that the evidence seized during the execution of the search warrant should be suppressed because the affiant failed to disclose material information to the Magistrate Judge. The Court disagrees and **DENIES** the motion for a *Franks*[1] hearing and the motion to suppress.

**I.     BACKGROUND**

    In late March 2023, Mr. Githens began chatting online with an undercover FBI agent.[2] The agent had set up a profile on Grindr only one hour before, which is a social networking and

---

[1] *Franks v. Delaware*, 438 U.S. 154 (1978).

[2] Because only this information was known to the Magistrate Judge who issued the search warrant, the Court confines its recitation of the background facts in this section to that which is found in the affidavit relied upon by the Court when issuing the search warrant.

1    dating app "targeted toward members of the gay, bisexual, transgender, and queer community."
2    (Doc. 41-2 at 5, n. 1) The agent's profile indicated he was a "'taboo-friendly' uncle," meaning
3    that he was interested in sexual activity, "such as incest, rape, or sex with a minor." *Id*. at n. 2.
4    The agent "placed 'tags' on the account such as 'dirty, discreet, curious, and parent." *Id*. at 5.
5    Grindr notified the agent that Githens found the false profile by searching for the tag, "parent." *Id*.
6    at p. 6. Githens identified himself as a 45-year-old man "'who loved Taboo.'"[3] *Id*. at 6.

7        Initially, Githens and the agent chatted on the Grindr app, but Githens soon proposed that
8    the two continue communicating on "Telegram," which is an "encrypted, cloud-based and
9    centralized instant messaging service. The application also provides optional end-to-end
10   encrypted chats . . ." (Doc. 41-2 at 6, n. 3) Githens suggested using Telegram because the
11   messaging service was "considered to be more secure." *Id*.

12       During the chats, the agent represented that he was sexually active with his 7-year-old
13   niece. (Doc. 41-2 at 6) The agent indicated that he sometimes babysat the child while the child's
14   mother worked. *Id*. at 7. Githens shared that he was sexually interested in children as young as
15   "babies," and that he had been "started young" as a 5-year-old when his babysitter's husband
16   molested him. *Id*. at 7. Githens told the agent that the youngest child he had "had" was "5." *Id*. at
17   7. He added, "We made out, touched, and he would jack me off." *Id*.

18       In response to the agent's claims about his sexual activity with the 7-year-old, Githens
19   indicated that, "that he loved 'little puffy pussy lips' and would 'love to have a dad or uncle invite
20   me'." (Doc. 41-2 at 7) The agent clarified that Githens wasn't just talking but actually wanted to
21   engage in the acts. He asked, "And you aren't about fantasy?" Githens affirmed that he was "not
22   about fantasy" and that he was "experienced," and that he "need[ed] it again." *Id*. Githens
23   detailed that he wanted to perform oral sex on the girl (*Id*), have sexual intercourse with her and
24   have her perform oral sex on him (*Id*. at 10). He said that he wanted to "breed her" and to "cum
25   inside her pussy," and wanted the agent to "'try to get her to orgasm. I know boys that young can.

---

[3] Later, Githens shared that he was married to a man who was "into 'young' (as young as 8 years-old) as well and had been with as young as 13 years-old. [Githens'] reiterated that his husband was 35, Mexican, and they had been together for 13 years." (Doc. 41-2 at 8)

1    They moan and stuff. Shake etc. Dry cum'." *Id*. at 9. Githens asked for a photo of the girl

2    watching cartoons, and the agent sent an FBI-approved photo of a purported 7-8-year-old girl in

3    bed with the sheet lifted, so that the camera angle was on the girl's stomach and panties. (Doc.

4    41-2 at 12)

5        Githens explained that he wanted to "touch you both," in reference to the agent and the

6    girl, and the agent refused, saying, "Well if we ever did meet up. I'm not into guys your age. Not

7    sure if that's a dealbreaker" . . . Just being honest." (Doc. 41-2 at 8. Githens replied, "Honestly

8    I'm not assuming we'll ever meet . . . Guys always flake . . . Always." *Id*. On another occasion,

9    when Githens said he wanted to meet the girl to have sexual contact with her, the agent said,

10   "You seem legit . . . You sure you'd be down. It's not fantasy. I'm for real." *Id*. at 10. Githens

11   responded, "I'm not messing with you . . . I'm real and don't want fantasy talk . . . I'm bored with

12   that." *Id*. He explained that he did not have any sexually transmitted diseases[4] and was willing to

13   take a "test." *Id*.

14       Githens discussed various trips he had gone on or had planned, which involved sexual

15   molestation of minors. He explained that in the past, he "had met man on Grindr and had agreed

16   to meet him in Hawaii and have sexual contact together with [the man's] one-year-old godson.

17   But due to Covid-19 travel restrictions, the trip never took place." *Id*. at 8.

18       Githens explained that he went to Mexico "about once a year." (Doc. 41-2 at 11) One

19   time, he paid a man in Mexico to procure a five-year-old child, but the man "scammed" him and

20   took the money and did not produce the child. *Id*. On another visit to Mexico, about seven years

21   before, he had touched his husband's 11-year-old nephew on the boy's "butt and crotch" using

22   Githens' foot. *Id*. at 9. Githens explained, "We weren't alone long so I couldn't do much . . . So

23   there's never much privacy . . . [the boy] kept coming to lay with me so I assume he liked it. A

24   few weeks after, he was caught having his 5yo cousin give him a bj ;) . . . I wanted to take at least

25   some of the credit for that." *Id*. He explained that since that time, "I've had teens since then

26   though . . . There's nothing like playing with young kids." *Id*. Githens explained that he "believed

27   ─────────────

28   [4] The agent asked, "Are you clean?" *Id*. Githens responded, "Yeah I am and on prep." *Id*. The agent asked, "Have any recent tests?" and Githens responded, "A month ago but I'd gladly get another first." *Id*.

that kids were 'property,' and that it used to be what your kids could do for you." *Id*. at 8.

The undercover agent and Githens exchanged photos and discussed meeting several times. Githens reported that the meeting would have to occur on a Thursday or a Friday (Doc. 41-2 at 11) Githens expressed that he would bring the girl her favorite candy and a doll from a Disney movie. *Id*. at 12. On March 30, 2023, the agent and Githens agreed to meet a week later, on April 7, 2023 in Fresno. *Id*. However, Githens "reiterated that he would like to video chat with the [undercover agent] sometime prior to traveling to Fresno and meeting in person." *Id.*

On April 4, 2023 at 4:54 p.m., the government emailed the Court the search warrant application and supporting documents (Doc. 41-2), including the affidavit, which contained detailed or verbatim accounts of the conversations between the FBI agent and Githens. (Doc. 48-1) The affidavit indicated that the FBI was "investigating GITHENS for online enticement of a minor, and the attempt to commit this offense, because he has clearly demonstrated his desire and intent to travel to Fresno, California to engage in sexual activities with someone he believes to be a minor." (Doc. 41-2 at 5) The search warrant application sought to search Githens' person, his home, and his car and to seize evidence because the affidavit asserted that "there is probable cause to believe that evidence of the commission, or attempted commission, of 18 U.S.C. § 2242 . . ." would be found in these locations. *Id*. at 22.

Later that evening at 7:20 p.m., Githens sent a message to the agent and said, "Hey, I'm going to need to cancel for this week . . . People get nervous." (Doc. 1 at 14.) The next morning at 8:55 a.m., Chief Magistrate Judge Kendall Newman issued the search warrant, without knowing that Githens had called off the April 7, 2023 meeting.

## LEGAL STANDARD

**A.     The Legal Standard Governing a Request a *Franks* Hearing**

In challenging the veracity of an affidavit in support of a search warrant, the "inquiry begins with a presumption that an affidavit in support of a search warrant is valid." *United States v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004). A defendant is entitled to an evidentiary hearing

9

under *Franks*[5] only if he "makes a substantial preliminary showing" that: (1) the affiant agent intentionally or recklessly made false or misleading statements or intentionally omitted facts; and (2) the false or misleading statements or omissions were material, that is, were necessary to the finding of probable cause. *United States v. Craighead*, 539 F.3d 1073, 1080–81 (9th Cir. 2008) (quoting *Franks*, 438 U.S. at 155–56); *see also United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) (citing *United States v. Martinez-Garcia*, 397 F.3d 1205, 1214–15 (9th Cir. 2005)); *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011); *United States v. Johns*, 851 F.2d 1131, 1133 (9th Cir. 1988). An evidentiary hearing is required if the defendant presents specific allegations, alleges a deliberate falsehood or reckless disregard for the truth, and supports that claim with a sufficient offer of proof. *Craighead*, 539 F.3d at 1080 (citing *United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983)). To prevail on a *Franks* challenge, the defendant must demonstrate both requirements by a preponderance of the evidence. *Perkins*, 850 F.3d at 1116. If the defendant does so, the "warrant must be voided and the fruits of the search excluded." *Id*. (quoting *Franks*, 438 U.S. at 156).

Under *Franks*, the defendant must show that the affiant intentionally or recklessly made misleading statements or omissions. *Craighead*, 539 F.3d at 1080–81. Generally, "a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks*, 438 U.S. at 165. In the context of omissions, "[b]y reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw." *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985), *amended by* 769 F.2d 1410 (9th Cir. 1985). To do so would "effectively usurp[] the magistrate's duty to conduct an independent evaluation of probable cause." *Perkins*, 850 F.3d at 1118; *see also Johns*, 948 F.2d at 606–07 (omitting facts that "cast doubt on the existence of probable cause" makes such omissions material); *United States v. Flores*, 679 F.2d 173, 177 n.1 (9th Cir. 1982) ("A magistrate cannot adequately determine the existence of probable cause with the requisite judicial neutrality and independence if the police provide him or

---

[5] Where such a challenge is raised, however, the affidavit in support of a warrant is entitled to "a presumption of validity." *Franks*, 438 U.S. at 171.

her with a false, misleading, or partial statement of the relevant facts."). However, an affiant's "negligent or innocent mistake does not warrant suppression." *Perkins*, 850 F.3d at 1116.

The second *Franks* step requires the defendant to show that the misleading statement or omission was material, i.e., necessary to the probable cause determination. *Perkins* at 1116. In the context of omissions from the supporting affidavit, "[t]he key inquiry is 'whether probable cause remains once the evidence presented to the magistrate judge is supplemented with the challenged omissions.'" *Id.* at 1119 (quoting *United States v. Ruiz*, 758 F.3d 1144, 1149 (9th Cir. 2014)). Stated differently, an omission is material where the inclusion of the omitted facts would "cast doubt on the existence of probable cause." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 435 (9th Cir. 2010) (quoting *United States v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992)). Of course, probable cause exists if there is a "fair probability" that a suspect has committed a crime based on the totality of the circumstances. *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983). The probable cause standard does not require a court "to believe to an absolute certainty, or by clear and convincing evidence, or even by a preponderance of the available evidence, that [a suspect] had committed a crime." *United States v. Lopez*, 482 F.3d 1067, 1078 (9th Cir. 2007); *see also United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (*en banc*). If the defendant meets this burden, then "the Fourth Amendment requires that ... the fruits of the search [must be] excluded to the same extent as if probable cause was lacking on the face of the affidavit." *United States v. Frost*, 999 F.2d 737, 743 (3d Cir. 1993) (quoting *Franks*, 438 U.S. at 156).

Mr. Githens asserts that the following material facts were omitted by the agent in the affidavit: that "Defendant, a 44 year old gay man who stated he had never engaged in sexual activity with a female and that female genitalia was a turn off[6]," that Githens "(1) desired a sexual encounter with the adult male OCE; (2) engaged in sexualized messages with the OCE about the

---

[6] Githens' assertion in his reply that he told the agent that female genitalia was a "turn off" is not supported. To the agent, after he said he "loved" "little puffy pussy lips" (Doc. 41-2 at 7), Githens reiterated that he liked this but reported he had never "been with" a female of any age. *Id.* at 8. When the agent questioned why he would say the "liked puffy pussy lips," Githens stated, "I do. I've only seen then [sic] . . . In vids . . . Turn off I guess lol." *Id.* Exactly what Githens meant by the last comment is unclear but, of course, this evidence was presented in the affidavit.

11

OCE's niece that were "just all talk" at the request of the OCE, to sexually stimulate the OCE; and (3) stopped communicating with, and responding to, the OCE prior to the April 4, 2023, cancellation of the meeting" and "that on April 4, 2023, Defendant cancelled the scheduled meeting." (Doc. 51 at 1-2)

The Court disagrees. First, the information contained in the first three points, was contained in the affidavit. The affidavit detailed that Githens' age and reported that he was gay and had never had sexual contact with a female. (Doc. 41-2 at 7-8) Githens indicated he wished to "make out with you both . . . Touch you both," while referring to the girl and the agent. *Id*. at 7. The affidavit revealed that the undercover agent indicated many times that what Githens texted was "hot," and "sexy," and made other comments indicating that the agent was sexually stimulated by Githens' statements including that it "Gets me hard af." *Id*. at 7, 8, 9, 10, 11,14) Rather than asserting that it was "just talk," Githens stated twice that it was not fantasy and that he "needed it again," while referring to sexual contact with a child and he continued to make statements about the sex acts he intended to perpetrate on the girl even after the agent told him that he "was not into guys your age."[7] *Id*. at 7, 8, 9, 10, 11, 12. Finally, the affidavit contained no information that there was any contact between the agent and Githens between March 30, 2023 and the date the search warrant package was presented to the court nor did it imply that there had been additional contact.[8] *Id*. at 13.

Finally, the evidence demonstrates that at the time the government emailed the search warrant package to the Magistrate Judge, Githens had not canceled the meeting. (Doc. 48-1 at 2; Doc. 51 at 4-5) Githens did not cancel the meeting until about three hours after the package was sent to Judge Newman. Thus, the Court cannot find that the agent made any omission in the

---

[7] The argument that Githens made his statements to stimulate the agent is undercut by Githens discussing his attempts to engage in sexual contact with children that did not come to fruition, such as his being "scammed" in Mexico, when he tried to procure a five-year-old for $400 or when he made plans to travel to Hawaii to molest a one-year-old but was prevented from doing so by the pandemic. These failed attempts seem to have been expressed to the agent to lend credence to Githens' assurances that he fully intended to act, rather than to merely talk.

[8] Notably, the affidavit also detailed Githens reported on March 27, 2023 that he had a friend visiting and he "would be too busy to message." *Id*. at 10. Githens also reported that he worked 70% from home but also worked "onsite." (Doc. 41-2 at 14) When asked if he had a "ton of meetings," he reported, "Some days more than others. Today is a little lower key." *Id*.

affidavit.

Even still, Githens argues that the agent should have disclosed to the judge that Githens had canceled the meeting. The Court disagrees that this failure prevented the judge from making his own, independent evaluation of the application. In any event, the Court finds that if this information were included and the affidavit plainly stated that that Githens had not communicated with the agent in the days following March 30, 2023, the Court would find there was probable cause to issue the search warrant. *Illinois*, at 235 ["[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."]

First, though Githens agreed on March 30, 3023, that he would travel to Fresno on April 7, 2023, he also indicated that, "He would like a video chat with the [agent] sometime prior to traveling to Fresno and meeting in person." (Doc. 41-2 at 13) Thus, though it was clear that the meeting was scheduled, there was also information suggesting that the meeting may not occur, i.e., if the video chat did not occur or it was not satisfactory to Githens.

Second, the Court disagrees that Githens' statement canceling the meeting negatively impacted the probable cause determination. *United States v. McCarron*, 30 F.4th 1157, 1163 (9th Cir.), cert. denied, 143 S. Ct. 388 (2022) ["[A] defendant who "proposes a rendezvous to perform" the sex acts he has described to the minor "has crossed the line toward" attempting to violate the statute," quoting *United States v. Goetzke*, 494 F.3d 1231, 1237 (9th Cir. 2007). Moreover, rather than indicating that he was exiting from the scheme or suggesting that he never intended to follow through with a meeting, Githens texted, "Hey, I'm going to need to cancel for this week . . . People get nervous." (Doc. 1 at 14.) A reasonable inference was that he was postponing the meeting, not because of his desire to comply with the law, but out of a fear of being caught. Adding in the fact that there was no contact with Githens on April 1, 2 or 3 suggests that Githens wanted to develop greater confidence that he would not be caught, rather than any intention that he would never meet the girl.

Finally, the Court also rejects Githens' argument that his speech was protected by the First Amendment and finds that his reliance on *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), is misplaced. "The inducement of minors to engage in illegal sexual activity enjoys no

First Amendment protection." *United States v. Meek*, 366 F.3d 705, 721 (9th Cir. 2004). Githens' acknowledges that the Ninth Circuit in *Meek* has rejected that *Ashcroft* establishes any First Amendment protections as to speech which is "merely a vehicle through which a pedophile ensnares the victim." *Meek* at 721. Even still, he argues that *Meek* doesn't control because unlike the defendant in *Meek,* Githens was communicating only with an adult.

As noted by the government, in *United States v. Macapagal*, 56 F.4th 742, 745 (9th Cir. 2022), cert. denied, 143 S. Ct. 1791 (2023), the Court held, "We take this opportunity to stress that so long as the government proves the defendant's intent was to obtain sex with a minor, it does not matter that the phone or internet communications occurred only between the defendant and an adult intermediary." This Court in *United States v. Carter*, 2006 WL 997867, at *7 (E.D. Cal. Apr. 17, 2006) held similarly: "Speech attempting to arrange the sexual abuse of children is no more constitutionally protected than speech attempting to arrange any other type of crime."

As noted above, Githens told the agent that he "would love to have a dad or uncle invite me" to engage in sexual contact with a child. (Doc. 41-2 at 7) He detailed the sex acts he wanted to do with the girl and the gifts he would bring her when they met. *Id*. at 12. Then he scheduled a meeting with the agent and the girl when these sex acts would occur. *Id*. at 13. All of this is sufficient to find that he was seeking to induce the child to engage in sexually explicit conduct through the intermediary.

## CONCLUSION

For the reasons set forth above, defendant's motion for an evidentiary hearing under *Franks* and the motion to suppress (Doc. 48) the seized evidence is **DENIED**.

IT IS SO ORDERED.

Dated:   **May 22, 2024**

_____
UNITED STATES DISTRICT JUDGE

14