Marc Days, CA Bar #184098
Days Law Firm
1125 T Street
Fresno, California 93721
Telephone: (559) 708-4844

Attorney for Defendant,
RODGER GITHENS

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>RODGER GITHENS,<br><br>                    Defendant. | No. 1:23-cr-00089-JAO<br><br>DEFENDANT'S SENTENCING MEMORANDUM<br><br>Date:   July 24, 2026<br>Time:   9:00 am<br>Judge:  Hon. Jill A. Otake |

**TABLE OF CONTENTS**

**Pages**

TABLE OF AUTHORITIES.................................................................................................ii

I.      INTRODUCTION.................................................................................................1

II.     LEGAL ARGUMENT ..........................................................................................3

III.    DR. GITHENS HISTORY AND CHARACTERISTICS .....................................6

A.      Brief Statement of Childhood............................................................................6

B.      Brief Statement of Education and Employment Period. ....................................6

C.      Treatment, Growth, and Contributions While In Custody. ...............................8

IV.     DR. HOWSEPIAN'S REPORT ..........................................................................11

V.      RECIDIVISM DATA...........................................................................................13

VI.     THE CHILD PORNOGRAPHY GUIDELINES NEGATE THE EFFORT TO TREAT SIMILAR CONDUCT SIMILARLY AND TO PROVIDE PROPORTIONALITY AMONG DIFFERENT GRADES OF SERIOUSNESS....................................................16

VII.    18 U.S.C. § 3553 FACTORS ...............................................................................18

(1)     The nature and circumstances of the offense and history and characteristics of the defendant. ............................................................................................................18

(2)     The need for the sentence imposed. ................................................................19

(3)     The kinds of sentences available. ...................................................................20

(4)     The kinds of sentence and the sentencing range established...........................20

(5)     Any pertinent policy statement issued by the Sentencing Commission...........22

(6)     The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. ...................................22

(7)     The need to provide restitution for any victims of the offense. ......................24

VIII.   CONCLUSION ....................................................................................................24

Table 1 – Comparable Sentences in the Eastern District of California

Table 2 – Comparable Sentences in the District of Hawaii

U.S. v. Githens, 1:23-cr-00089-JAO
Defendant's Sentencing Memorandum

## TABLE OF AUTHORITIES

**Pages**

**FEDERAL CASES**

*Gall v. United States*
552 U.S. 38 (2007)............................................................................................... 4

*Kimbrough v. United States*
552 U.S. 85 (2007)............................................................................... 4, 5, 6, 16

*May v. Shinn*
37 F.4th 552 (9th Cir. 2022) ......................................................................... 13, 14

*Nat'l Ass'n for Rational Sexual Offense Laws v. Stein*
2023 U.S. Dist. LEXIS 241047, 2023 WL 11897163 (M.D.N.C. Sept. 9, 2023) ..................... 15

*Rita v. United States*
551 U.S. 338 (2007)............................................................................................. 4, 5

*United States v. Booker*
543 U.S. 220 (2005)............................................................................................. 3

*United States v. Boudreau*
154 F.4th 1132 (9th Cir. 2025) ..................................................................... 22, 23

*United States v. Dorvee*
616 F.3d 174 (2d Cir. 2010)............................................................... 5, 16, 17, 20

*United States v. Furr*
No. 19-cr-00033-LEK (D. Haw.).......................................................................... 19

*United States v. Grober*
624 F.3d 592 (3d Cir. 2010)............................................................... 17, 18, 20

*United States v. Haider*
No. 2:23-cr-00299-DC (E.D. Cal.) ........................................................... 2, 3, 22

*United States v. Henderson*
649 F.3d 955 (9th Cir. 2011) ........................................................ 4, 5, 16, 17, 20

*United States v. Macapagal*
56 F.4th 742 (9th Cir. 2022) ....................................................................... 22, 23

*United States v. R.V.*
157 F. Supp. 3d 207 (E.D.N.Y. 2016) ................................................................. 14

-ii-

**FEDERAL CASES, CONTINUED**                                          **Pages**

*United States v. Rodriguez*
527 F.3d 221 (1st Cir. 2008)................................................................................. 4

*United States v. Stone*
575 F.3d 83 (1st Cir. 2009)................................................................................. 20

*United States v. Tibbets*
No. 1:18-cr-00241-DAD (E.D. Cal.) ................................................................... 18

U.S. v. Githens, 1:23-cr-00089-JAO
Defendant's Sentencing Memorandum

**FEDERAL STATUTES**       <u>**Pages**</u>

<u>**United States Codes**</u>
18 U.S.C. § 2252(a)(2) ................................................................................................. 18, 22
18 U.S.C. § 2252A(a)(5)(B) ................................................................................................ 23
18 U.S.C. § 2422(b) ..................................................................................................... 18, 23
18 U.S.C. § 3551 et seq. (Sentencing Reform Act) .............................................................. 3
18 U.S.C. § 3553 ................................................................................................. 4, 5, 18, 24
18 U.S.C. § 3553(a) ............................................................................................................. 20
18 U.S.C. § 3553(a)(1) .......................................................................................................... 4
18 U.S.C. § 3553(a)(2) ..................................................................................................... 1, 4
18 U.S.C. § 3553(a)(6) .......................................................................................................... 4
Adam Walsh Child Protection and Safety Act of 2006 ....................................................... 14
First Step Act of 2018 ......................................................................................................... 23

<u>**Federal Rules**</u>
Federal Rule of Criminal Procedure 11(a)(2) ....................................................................... 1

<u>**Federal Sentencing Guidelines**</u>
U.S.S.G. § 2G2.2 ............................................................................ 1, 5, 16, 17, 20, 21
U.S.S.G. § 2G2.2(a)(2) ......................................................................................................... 3
U.S.S.G. § 2G2.2(b)(2) ............................................................................................. 3, 17, 20
U.S.S.G. § 2G2.2(b)(3)(B) .................................................................................................. 17
U.S.S.G. § 2G2.2(b)(3)(F) .................................................................................................... 3
U.S.S.G. § 2G2.2(b)(4) ....................................................................................................... 17
U.S.S.G. § 2G2.2(b)(6) .................................................................................................. 3, 17
U.S.S.G. § 2G2.2(b)(7) ....................................................................................................... 17
U.S.S.G. § 2G2.2(b)(7)(D) .................................................................................................... 3

-iv-
U.S. v. Githens, 1:23-cr-00089-JAO
Defendant's Sentencing Memorandum

**OTHER AUTHORITIES** <u>Pages</u>

Matthew R. Durose et al., Bureau of Justice Statistics, U.S. Department of Justice, Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010 (2014)...................................................................................................................15

Patrick A. Langan et al., Bureau of Justice Statistics, U.S. Department of Justice, Recidivism of Sex Offenders Released from Prison in 1994 (2003)..........................................15

Maureen F. Larson & Robert F. Schopp, Sexual Predator Laws: Clarifying the Relationship Between Mental Health Laws and Due Process Protections, 97 Neb. L. Rev. 1167 (2019)..................................................................................................................14

The Freedom Fight, Sexual Addiction Screening Test.......................................................9, 10, 11

U.S. Sentencing Commission, Federal Sentencing of Child Pornography: Non-Production Offenses (2021)..............................................................................................20, 21, 22

U.S. Sentencing Commission, Report to the Congress: Federal Child Pornography Offenses (2012)...........................................................................................................20, 21

-v-

U.S. v. Githens, 1:23-cr-00089-JAO
Defendant's Sentencing Memorandum

## I.   INTRODUCTION

The defendant, Dr. Rodger Githens, respectfully requests this Honorable Court to sentence him to 120 months imprisonment, a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. §3553(a)(2).  A sentence of 120 months is appropriate when considering (1) the history and characteristics of Dr. Githens (a factor recognized as warranting consideration by both probation and the government given his upbringing and extraordinary efforts toward rehabilitation for himself and others), (2) the report and diagnosis of psychiatrist Dr. A.A. Howsepian (**Exhibit A**[1]), (3) sentences imposed by courts for defendants who have engaged in similar - as well as more egregious conduct, (4) recidivism data; and (5) that several Circuit Court of Appeals, including the Ninth Circuit, have recognized that district courts need not defer to USSG §2G2.2.

Dr. Githens recognizes he engaged in unconscionable acts and that his conduct is unjustifiable.  Accordingly, he made several requests to plead guilty pursuant to Rule 11(a)(2), to preserve his constitutional challenge to the search for appellate review and to permit the government to avoid preparing for trial and the court to allocate its resources effectively.[2]  When the government rejected these requests, Dr. Githens requested a stipulation facts bench trial to avoid the government's need to prepare for trial and allow the court to allocate its resources effectively.  The defense believes a downward variance is also appropriate under these circumstances.

Relative to federal child pornography cases, Dr. Githens received and distributed a small amount.  What is notable, and less egregious than the cases in the attached case comparisons tables (Table 1 and Table 2), is that unlike many defendants, Dr. Githens "did not commit to a

---

[1] **Exhibit A**, Dr. Howsepian's report, has been filed under seal.

[2] On January 5, 2026, Dr. Githens notified the government via email that he was willing to enter a guilty plea with a Rule 11(a)(2) agreement.  Then again on January 20, 2026, Dr. Githens informed the government via email that he was willing to plead guilty under Rule 11(a)(2).  The request was again made to the government a week before trial and then again, the morning of trial.

specific date" to meet the OCE or the OCE's purported niece, "stopped responding to the OCE's message," and did not show up to meet a minor or purported minor.  [PSR ¶16].[3]  As shown by the case comparisons tables, the content of the child pornography and chats he engaged in are unfortunately not unusual.

For example, in *United States v. Haider*, case #2:23-cr-0299-DC (EDCA), the government informed the magistrate judge at the detention hearing that the defendant shared child pornography videos, one of which included a child being raped and ejaculated on while crying in pain.  [**Exhibit B** at pg. 8].[4]  The defendant described wanting a prepubescent girl pulled up "by a rope and sexually assaulted by an adult male and a dog."  *Id*.  The defendant also talked about molesting children, including the daughter of the person he was messaging, and that it would be something fun to him.  *Id*. at pg. 9.  In response, the magistrate judge stated:

> I'm also well aware in the world of sex offense – offenses, there are very disturbing fantasies that do not necessarily get acted out in real life and having images and conversations related to those fantasies is illegal and carries with it very stiff penalties but does not in and of itself indicate to me that the children are necessarily in danger . . . *Id*. at pg. 14.

Supporting the magistrate judge's awareness of the world of sex offenses is scientific literature, including one of the most cited articles in the psychology field with regard to internet behavior.  As noted in Dr. A.A. Howsepian's report:

> It is important to highlight how fundamentally different internet communication is from face-to-face interactions.  Communicating online is centrally characterized by *anonymity* (particularly if those interactions involve visual anonymity), the *rapid development of rapport*, an a*dmixture of unfiltered self-disclosure* with *exaggeration, prevarication,* and an emphasis on *role-playing* and *fantasy* with a tendency jointly to retreat from reality by the imaginative construction of shared online 'alternate realities,' all without the fear of being 'discovered' by friends or family for one's immersion in what might involve highly socially unacceptable, highly disturbing conversations (Joinson, 2001).  There is, in these contexts, the frequent adoption of personas that are not at all in line with one's actual values, actions, identities, intentions and desires *actually* to

---

[3] Attached Table 1 is a case comparison table of cases from the Eastern District of California. Attached Table 2 is a case comparison table of cases from the District of Hawaii.

[4] Attached as **Exhibit B** is a copy of the transcript of the Arraignment and Detention Hearing in *U.S. v. Haider*, case #2:23-cr-00299-DC (EDCA).

U.S. v. Githens, case #1:23-CR-00089-JAO     -2-
Defendant's Sentencing Memorandum

engage in the fantasied behaviors when *not* online – an interactional process facilitated by the "online environment's architecture" (Joinson, 2001).

As a result, one's online 'internet' self – which might *appear* predatory – and one's offline 'true' self are frequently not concordant.  Consistent with previous work by Walther (1996), Suler (2004) – in one of the most cited articles in the psychology literature with regard to internet behavior – identifies six interacting factors that, together, account for this 'online disinhibition' effect, namely, *dissociated anonymity* (in which persons feel that their online actions are not linked to their real-world identities, leading to "disinhibition" or decreased responsibility), *invisibility, asynchronicity* (insofar as communication does not occur in real time), *solipsistic introjection* (in which one may feel that one's mind has merged with the mind of one's online interlocutor and in which reading one's interlocutor's messages might be experienced as a voice in one's head, as if that person's psychological presence and influence have been assimilated or introjected into one's own mind), *dissociative imagination* (in which a person believes that the people with whom one is communicating are not real), and *minimization of authority*, supporting the view that one's online persona is *critically* shaped by one's *online environment* and, therefore, should not be interpreted as *who one really is*.  [Exhibit A at pgs. 35-36].

Defendant Haider received a sentence of 108 months followed by a term of 120 months of supervised release.[5]  According to the government, in addition to the messages described above, Defendant Haider distributed and traded CSAM videos.  [Ex. B at pgs. 8-9].  According to the Factual Basis in the plea agreement, defendant Haider was a member of a number of on-line groups dedicated to sharing information, images, and/or videos of child sexual abuse for sexual gratification.[6]  Defendant Haider used an internet based application to post, receive, and discuss other videos and content depicting the sexual abuse of babies and children, including videos depicting physical torture and rape, babies and children crying and squirming in pain as they are being sexually abused, bestiality, and BDSM.[7]

///

---

[5] The plea agreement estimated a guideline range of 151-188 months based on a criminal history I, base offense level of 22 (§2G2.2(a)(2)), + 2 for a minor under 12, (§2G2.2(b)(2)), +2 for distribution (§2G2.2(b)(3)(F)), +4 for sadistic and infant/toddler), +2 for use of a computer (§2G2.2(b)(6)), and +5 for over 600 images (§2G2.2(b)(7)(D)).

[6] *U.S. v. Haider*, case # 2:23-cr-00299-DC (EDCA) at Dkt 63, pg. 15 of 15.

[7] *Id.*

U.S. v. Githens, case #1:23-CR-00089-JAO          -3-
Defendant's Sentencing Memorandum

## II.    LEGAL ARGUMENT

As is widely known post *Booker*, virtually anything is a valid issue for the court to consider when imposing a sentence.  The Sentencing Reform Act, 18 U.S.C. §3551 et seq., imposes an "overarching provision" that district court must select a sentence "sufficient but not greater than necessary" to achieve the sentencing goals in §3553(a)(2).  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  The factors set forth in §3553 comprise "a tapestry of factors, through which runs the thread of an overarching principle," the court's duty to "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing."  *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008).

Section 3553(a)(1) begins with the "broad command" to consider the nature and circumstances of the offense and the history and characteristics of the defendant.  *Gall v. United States*, 552 U.S. 38, fn. 6 (2007).  Section 3553(a)(2) requires the court to consider the need for the sentence imposed to provide just punishment, protect the public, and provide needed treatment.  Section 3553(a)(6), requires the court to consider the need to avoid unwarranted sentencing disparities, and the court "must take account of sentencing practices in other courts."  *Kimbrough*, at 108.

The Supreme Court envisions that a district court will always consider arguments that the Guideline sentence should not apply because the guideline itself fails properly to reflect §3353(a) considerations, reflects an unsound judgment, does not treat defendant characteristics in the proper way, or that a different sentence is appropriate regardless.  *Rita v. United States*, 551 U.S. 338 (2007); *Kimbrough*, at 101.  The Supreme Court has made clear that a sentencing court may vary downward based on the lack of empirical support underpinning the applicable guidelines.  *Kimbrough*, at 109-110.  As the Court explained, the Commission generally developed the Guidelines "using an empirical approach based on data about past sentencing practices."  *Id*. at 96.  "The Commission's deviation from its characteristic institutional role" affords "the district court with greater leeway to vary from the guideline."  *Id*. at 109-110.

The Ninth Circuit has held that like the crack-cocaine Guideline in *Kimbrough*, the child pornography Guidelines were not developed in a manner "exemplifying the Sentencing Commission's exercise of its characteristic institutional role." *United States v. Henderson*, 649 F.3d 955, at 960 (9th Cir. 2011). Judge Berzon, in her concurring opinion, wrote "to emphasize that unjust and sometimes bizarre results will follow if §2G2.2 is applied by district courts without a special awareness of the Guideline's anomalous history." *Henderson*, at 964-965. Unless applied with great care a guideline that is not based on empirical data can lead to substantively unreasonable sentences. *United States v. Dorvee*, 616 F.3d 174, 184 (2nd Cir. 2010) (holding the district court's within guideline sentence under §2G2.2 substantively unreasonable).

Along with this, the Court places nothing off-limits for district courts. All the Guidelines are advisory and a judge may determine that any within Guidelines sentence is "greater than necessary" to serve the objectives of sentencing. *Kimbrough*, at 91.

It is against this instruction that the factors in 18 U.S.C. §3553 are to be examined in the present case – for markers to discover whether the Guideline Range "does not generally treat certain defendant characteristics in the proper way" or "the case warrants a different sentence regardless" *Rita, at* 351 and 357.

A short summary of the unique factors of the case supports a sentence of 120 months for Dr. Githens. The Court is urged to read the attached letters for a deeper understanding of who Dr. Githens is as told by those who know him best: family, friends, and colleagues. Additionally, we urge the Court to review the report of Dr. A.A. Howsepian, a well-respected forensic psychiatrist, who has testified in court as an expert on over 90 occasions and has been retained a number of times by the prosecution - including the federal government - and has testified in that capacity multiple times. As well, the defense urges the Court to consider sentences imposed by other courts and recidivism data. Lastly, the Court is urged to consider that USSG §2G2.2 was not developed "using an empirical approach based on data about past sentencing practices," which affords even "greater leeway to vary from the guideline."

U.S. v. Githens, case #1:23-CR-00089-JAO          -5-
Defendant's Sentencing Memorandum

*Kimbrough*, at 96 and 109-110; see also *Henderson,* at 960 (the child pornography Guidelines like the crack-cocaine Guidelines were not developed in a manner that exemplifies the Commission's exercise of its characteristic institutional role "so judges must enjoy the same liberty to depart from them based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in *Kimbrough*").

### III.    DR. GITHENS' HISTORY AND CHARACTERISTICS

#### A.  Brief Statement of Childhood.

Starting at the beginning, Dr. Githens has an extensive family history of mental health and neurological problems.  This history is documented in the Family Psychiatric and Neurological History section and Interviews, at pages 4 and 18-20 of Dr. Howsepian's report. [Exhibit A].  Close family members have suffered from a number of mental health disorders, extreme abuse, various addictions, years of psychotherapy, and suicide.

Dr. Githens, at a young age, suffered severe emotional trauma, witnessed and endured extreme and repeated domestic violence, was abused by his father, and was bullied by classmates through middle school because he sounded and acted gay.  The extreme trauma, abuse, and violence led to family separation, the untimely death of his younger brother, his father committing suicide, and a number of unresolved issues.  Dr. Githens sought psychotherapy from multiple therapists, none of which were in a position to adequately address his emotional concerns.  [Exhibit A at pgs. 5-6].

#### B.  Brief Statement of Education and Employment Period.

These disturbing experiences are contrasted to Dr. Githens' life of accomplishments, healthy relationships, and commitment to helping others. He received straight A's, became local chapter and area President and state Vice-President of the Future Business Leaders of America. He obtained bachelor's degrees in History and Religious Studies, a Master of Education focusing on Human Resource Development, and a Ph.D. in Human Resource Development with a specialization in Organization Development and Change.

He worked as an assistant and associate professor, taught in community based programs, including the U.S. Army and the local police training academy, he helped community colleges develop online workforce development programs, became a tenured professor, rose to associate dean and was awarded the Endowed Chair for the Leadership and Organizational Development program at the University where he was employed.  He has also worked as a volunteer translating course material in Spanish to help provide access for others.  [Dkt 112 at pg. 87 of 105].

Dr. Githens' former partner describes the care and humanity shown by Dr. Githens even after their breakup.  [Dkt 112 at 103-104 of 105].  Dr. Githens remained supportive, and along with his spouse (Juan De La Cruz) would visit his former partner and his mother.  *Id*.  His former partner describes how after being the victim of a violent attack and suffering devastating injuries, he visited Dr. Githens and his spouse to "refresh" from the horrific ordeal.  *Id*.

A member of the personnel committee that reviewed his tenure application describes how within five years of joining the faculty as a brand-new Ph.D., Dr. Githens grew into a nationally recognized leader in the field of Human Resource Development and that his overarching theme was fostering humane, accessible, and diverse workplaces.  [Dkt 112 at pg. 90 of 105].  She goes on to describe Dr. Githens as "humane in his dealing with people and always ready to help others regardless of the status of those who asked for help.  And he was not afraid of speaking the truth when it was necessary."  *Id*.  She gives examples of Dr. Githens' genuine concern for others, including an example that while pre-tenured and at risk of not gaining tenure, he spoke out about wrong and unethical actions that would negatively affect women.  *Id*.  Colleagues and students have described Dr. Githens as follows:

- "Dr. Githens is a remarkable colleague, always willing to assist and be supportive of others."  "He is . . . always focused on how to do things better with the student's best interest at the forefront."  [**Exhibit C** at pg. 2].[8]

- "Dr. Githens creates safe learning spaces so that students are willing to take risks and

---

[8] Attached as **Exhibit C** is Dean's Review, Annual Evaluation 2020, Dr. Patricia Campbell.

push their learning and thinking." [**Exhibit D** at pg. 2].[9]

- "Dr. Githens' teaching practice is a shining example of [being] reflective and innovative.  He's never one to be satisfied with that status quo and even when a class has gone well, he still looks for ways to improve his practice." [**Exhibit E** at pg. 2].[10]

- "Dr. Githens is kind and caring.  He is supportive, and he has just the right way to push you to do your best.  I've seen him tailor this to each individual student. Honestly, I would not have been a student in this program if it wasn't for Dr. Githens, nor would I have finished as successfully as I did.  He's wonderful." (Anonymous student comment from university report about Dr. Githens, 2021).  [**Exhibit F** at pg. 13].[11]

- "Dr. Githens is one of the best colleagues I've ever worked with at Benerd." (Anonymous faculty comment from university report about Dr. Githens, 2021). [Exhibit F at pg. 47].

Because of his concern that his practitioner experience was becoming dated, Dr. Githens started a consulting business in 2011.  A fellow consultant described him as "extremely talented, smart, and reflective." [Dkt 112 at pg. 87 of 105].  He is skilled at helping individuals and organizations stay in alignment and address challenges, such as conflict, confusion, failures, and lack of direction.  [Dkt 112 at pg. 86 of 105].  He has helped, to name a few, the United States Department of Agriculture, the United States Department of Energy, Western Area Power Administration, the California State Office of the Public Defender, and  he led a research and facilitation team for a stakeholder working group for California Senate Bill 206 (SB 206) and its creation of a public report and recommendations for the legislature.  The group's core

---

[9] Attached as **Exhibit D** is Assistant Dean's Review, Annual Evaluation 2020, Dr. Laura Hallberg.

[10] Attached as **Exhibit E** is Assistant Dean's Review, Annual Evaluation 2021, Dr. Laura Hallberg.

[11] Attached as **Exhibit F** is Tenure Review for Dr. Rod Githens.  References quoted, as well as other pertinent quotes are highlighted yellow.

U.S. v. Githens, case #1:23-CR-00089-JAO      -8-
Defendant's Sentencing Memorandum

recommendation, arrived at through a consensus building process facilitated by Dr. Githens, resulted in a new bill signed into law by the governor in 2021.  [Dkt 112 at 87 of 105].

### C.  Treatment, Growth, and Contributions While In Custody.

While in custody he has been purposeful in helping others and has been focused on understanding how and why he transgressed, and self-improvement.  He describes that his time in custody "stripped [him] down to [his] core" and he made the purposeful decision to grow and better himself and investigate his mental health, emotional condition, and spiritual beliefs to try and understand why he engaged in the activity that has brought him before the Court.  He describes his behavior as "unjustifiable," "troubling," "self-delusional," and "despicable." [PSR ¶32 and Dkt 112 at pg. 27 of 105].

While in custody Dr. Githens immersed himself in the Edovo educational system, which provides educational, inspirational, and motivational courses, accumulating over 7,500 points. [PSR ¶4].  He also read countless books on Spiritual Living, Self Help, and Addiction Recovery, twenty-eight, but not all, of which are identified in his letter to the Court.  [Dkt 112 at pg. 30-32].

While in custody Dr. Githens has done so much more than take a remarkable number of educational courses and read countless books to grow and better himself and understand how he came to engage in the conduct that brings him before the Court.  He has impacted and changed lives.

Dr. Githens was first housed at the Fresno County jail and others took notice of his commitment to grow and better himself.  When violence escalated toward unaffiliated detainees, leaders of gangs and racial groups asked him to become the representative in his unit for detainees not affiliated with these groups – to help mediate problems.  He agreed to take on the role.  [PSR ¶32].  While he served as representative there were no instances of violence toward unaffiliated detainees.

Later, Dr. Githens was transferred to Taft and helped start a group based sexual offender treatment program (The Freedom Fight), which according to its website is a pornography and sex

U.S. v. Githens, case #1:23-CR-00089-JAO          -9-
Defendant's Sentencing Memorandum

addiction recovery program.[12]    The Freedom Fight program was developed over 20 years ago by Pastor Ted Shimer – a trained Pastoral Sex Addiction Professional-Supervisor – to provide a spiritually based, neuroscientifically informed program that helps persons overcome sex/porn addictions with evidence based tools and a support network.  The program reports that 86% of participants who complete the program and practice the core applications find lasting freedom from sexual addiction.  The program consists of 32 lessons.

Dr. Githens also started a Christian based Spiritual Development Group, consisting of between 6-10 participants, that meets weekly. [Dkt 112 at pgs. 30-31].  He is described as passionate about the program and that his attention to detail comes across in each week's discussion.  [Dkt 112 at pg. 100 of 105].  He designed a compilation of topics/videos and lesson sequences consisting of topics such as:  Sermon on the Mount Part 1 (The Beatitudes) (6 weeks); Is There a Limit to God's Forgiveness? (1 week); Advent (3 weeks); Sermon on the Mount Part 2 (7 weeks); Seeing God's Providence and Grace (1 week); God Encounters (3 weeks); Easter (3 weeks);  Hope and Surrender When Life Turns Out Different Than Expected or Desired (1 week); Love Speaks: Recognizing God's Multifaceted Voice (3 weeks); How Not to Lose Heart 2 Corinthians Chapter Four (4 weeks); and Meditation and Mindfulness for Life and Spiritual Practice (5 weeks).  [Dkt 112 at pgs. 30-31].  He makes worksheets for the group so participants can study for themselves and together.  [Dkt 112 at pg. 101 of 105].  His Bible study group meets once a week, and he also teaches the Freedom Fight Recovery group once a week.  [Dkt 112 at pg. 101 of 105].

Inmates describe Dr. Githens as "respectful and humble" and as the inmate who spends more time and effort thoroughly scrubbing the community showers each week than any other inmate.  [Dkt 112 at pgs. 85 and 100 of 105].  Similar to the Fresno County Jail, while at Taft, he

---

[12] On the Freedom Fight website, Alex Lerza, a certified sex addiction therapist, is quoted as saying, "The Freedom Fight offers one of the most impactful and thorough courses I have seen when it comes to helping people find freedom from porn and sex addiction."  In addition, The Freedom Fight website includes, at the bottom of the page, a "Sexual Addiction Screening Test" found at: https://thefreedomfight.org/sast/.  A battery of 20 questions determines if the person is suffering from an addiction to sex.

U.S. v. Githens, case #1:23-CR-00089-JAO        -10-
Defendant's Sentencing Memorandum

has been an unofficial dorm representative to liaison between management and the detainees and works to address many issues in a proactive manner. *Id.* He is described as setting an example for other inmates to follow and as a "uniquely disciplined individual" who is "uncommonly focused" and "spends the majority of his time reading and working on self-improvement, spirituality, and staying connected to his loved ones on the outside." *Id.*

He is described as "someone almost everyone in the dorm can come and talk to . . . regardless of age, race or religion." [Dkt 112 at pg. 85 of 105]. He is described as very approachable, compassionate, and empathetic to the needs of others. *Id.* He is described as someone who helps others fill out their paperwork and being available to listen and discuss personal family matters that are troubling fellow inmates. *Id.* Inmates are seen thanking him every day. *Id.* His presence in his dorm has been described as creating an "aura of harmony and respect." *Id.* His "Spiritual Development Group" is described as "a reason inmates started to interact and tolerate each other." *Id.* He is described as coming to The Freedom Fight meetings as prepared, open and transparent about his own high and low points of the week, asking God for help, bring effective group facilitation methods, mentoring others, and taking full ownership of his situation. *Id.*; [Dkt 112 at 100 of 105]. He is also described as an advocate for the importance of honesty to oneself and accountability to overcome addiction. [Dkt 112 at pg. 85 of 105]. He is described as positively impacting dozens of lives while in custody – incarcerated individuals, families, persons on the outside, and the public. [Dkt 112 at 100 of 105] [Dkt 112 at pg. 101 of 105]. One of many examples given is Dr. Githens' suggestion to have The Freedom Fight program ported over to a Christian app called Pando, where The Freedom Fight is now available to thousands of other incarcerated individuals who may have not discovered it. [Dkt 112 at 100 of 105]. While in custody he has also contributed to a volunteer effort with a colleague to help develop a group facilitation program in Africa. [Dkt. 112 at 87 of 105].

IV.    DR. HOWSEPIAN'S REPORT

Dr. Howsepian has evaluated Dr. Githens and provided a well-considered report addressing Dr. Githens' psychiatric, emotional and mental health, and his risk factors. Dr.

U.S. v. Githens, case #1:23-CR-00089-JAO        -11-
Defendant's Sentencing Memorandum

Howsepian spent 9.9 hours interviewing Dr. Githens. [Exhibit A at pg. 1]. He also interviewed Dr. Githens' mother and sister. *Id*. He reviewed a number of documents, including the complete transcript of the communications between Dr. Githens and the OCE, the Criminal Complaint and Affidavit of Special Agent Adam Bruflat in Support of the Criminal Complaint. *Id*. He also interviewed Dr. Githens' sister and mother. *Id*.

Dr. Githens has a significantly high ACE (Adverse Childhood Experiences) score, 7 out of 10. *Id*. at pg. 10. An ACE score codifies the principle of the relationship between chronic childhood stressors and adult physical and mental health outcomes. *Id*. at pg. 11. The ACEs score captures the cumulative neurobiological impact of ACEs. *Id*. at pg. 11. The greater one's ACEs load, the greater one's ACEs score, and the greater one's ACEs score, the greater one's physical and mental health problems later in life by way of biological stress on the developing brain. *Id*. at pg. 11-12. Over 50 peer-reviewed studies have corroborated these findings. *Id*. at 11. Although stress is a normal response to various challenging life events, when excessive – which, when extreme, is toxic stress – a child's brain is adversely affected. Such stress can – both immediately and in the long run – result in physical alteration in the brain's architecture and function, eventuating in social maldevelopment, mental illness, and physical health challenges. Id. at 12. For example, someone with an ACEs score of "4 or more" has a 4 to 12-fold increase, over those with an ACEs score of 0, of alcoholism, drug abuse, and suicide attempts (in one study, a 20-fold increase over those with ACEs scores less than 4). *Id*. at pg. 11.

Of note, Dr. Githens scored "0" on the Static 99R (the most widely used actuarial risk assessment instrument for adult male sex offenders, designed to estimate the likelihood of sexual recidivism). *Id*. at pgs. 2 and 43. The Static 99R employs 10 static (unchangeable factors) in order to categorize offenders into five risk levels, ranging from very low to high. *Id*. Offenders with scores of "0" on the Static 99R from the routine samples have been found to sexually recidivate at 1.8% to 4.4% after 5 years. *Id*. at pg. 43.

Dr. Githens was "low" risk in every category on the SVR-20 V2 (a 20-item, evidence based tool that focuses on both static (unchanging) and dynamic (changing) risk factors

U.S. v. Githens, case #1:23-CR-00089-JAO     -12-
Defendant's Sentencing Memorandum

appropriate for evaluating the risk of sexual violence recidivism – online child pornography consumption and distribution are considered a form of "sexual violence"). [Exhibit A at pgs. 2 and 42-43].

Dr. Howsepian found that Dr. Githens has no antisocial or narcissistic personality disorder and is not a pedophile. He found that Dr. Githens does not have a pedophilic disorder nor even the "interest" threshold for pedophilia. In Dr. Howsepian's opinion, the sexting interactions which included pedophilic content were driven by non-pedophilic motives. The report supports this finding in several ways:

- **Masochistic, relational motive rather than sexual interest in children.** The opinion is that Dr. Githens's interest in the CSAM was peripheral and instrumental — he portrayed himself as sexually "extreme" and "unrejectable" to secure the attention, acceptance, and felt connection from adults which he was starved of, mirroring the OCE's stated interests to keep the exchange alive.
- **An "autogynephilia analogy."** Where Dr. Githens reported arousal connected to abuse images, the report explains that his arousal was attached to imagining *himself* in the role of the abused child (consistent with his masochism and his father-conflict role-plays), not to children as sexual objects.
- **Aversion, not gratification.** Dr. Githens reported needing to be "desensitized" to view the material, described it as "dehumanizing," and reported "always" feeling guilt afterward — a reaction Dr. Howsepian notes is the opposite of what a pedophile's initial response would be.
- **Online disinhibition.** Dr. Howsepian grounds the fantasy-vs.-intent distinction in established research (Suler, Joinson, Seto, Broome), explaining why an online persona in sexting and role-play space should not be read as the offline person's true intentions.
- **No contact, no grooming, no proximity-seeking with minors, no compulsive CSAM collection** — the markers typical of pedophilic disorder are, in his assessment, absent. Notably, in diagnosing Dr. Githens' obsessive-compulsive disorder, Dr. Githens reported being a "'digital pack rat' (compulsively keeping digital files from college, for example)." Yet despite that trait, he had no extensive CSAM collection – the opposite of what one would expect of a person with genuine pedophilic interest and an obsessive-compulsive disorder.
- **The offense conduct itself.** Based on Dr. Howsepian's close reading of the 104-page transcript, he notes Dr. Githens repeatedly *creating distance* from any actual meeting involving the OCE's "niece" (stating he was "turned off" by female genitalia, going silent, and ultimately canceling), and that the OCE — not Mr. Githens — reinitiated contact after every lapse and pressed for the meeting.

## V.    RECIDIVISM DATA

Widespread misperceptions exist about the recidivism of those with child sexual abuse or CSAM convictions. As noted below, and reported by the Department of Justice, the recidivism rate for child sex offenders is exceedingly low in comparison to other offenders. The public's

U.S. v. Githens, case #1:23-CR-00089-JAO         -13-
Defendant's Sentencing Memorandum

hatred of child pornographers is part of its emotional reaction to all sexual crimes involving children. *May v. Shinn*, 37 F.4th 552, 561 (9th Cir. 2022) (Block, J. concurring). As noted by Judge Block, "[i]f anyone sexually assaulted one of my two adorable little grandchildren, I would probably be indicted for murder. But I understand as a rational jurist that I cannot let my judgments be based on my emotions." Id.

"Realistically, the public's fear of pedophiles running loose and abusing children should be tempered by the knowledge that we judges impose enormous constraints on their freedom even when they are not incarcerated." *Id*. "The treatment of sex offenders has borne many of the hallmarks of an unjustifiably punitive state. For instance, sex offenders as a class have been subjected to some of the most unforgiving and indiscriminate collateral consequences of conviction, such as unduly severe residency restrictions or registration requirements." *United States v. R.V.*, 157 F.Supp.3d 207 (EDNY Jan. 1, 2016) (quoting *Model Penal Code: Sexual Assault and Related Offenses*, General Commentary at 12 (AM. Law. Inst., Discussion Draft No. 2, 2015)).[13] "The Adam Walsh Act requires those convicted of specified sex crimes to register as sex offenders and sets up a national database to coordinate state sex-offender registries." *May v. Shinn*, at 561. "Moreover, stringent special conditions are routinely imposed during supervised release," which typically "includes mental health treatment, limitations on contact with children, limitations on computer access, and submission to random searches and other monitoring to ensure compliance." *Id*.

"Consequently, the data suggests that the recidivist rates for child sex offenders are low." *Id*. "For example, compared to a 67.8% re-offense rate for state prisoners in general over a

---

[13] In addressing federal sentencing for child pornography offenders, the district court stated: "Prosecution under the current sentencing framework has largely failed to distinguish among child pornography offenders with differing levels of culpability and danger to the community. The applicable structure does not adequately balance the need to protect the public, and juveniles in particular, against the need to avoid excessive punishment, with resulting unnecessary cost to defendants' families and the community, and the needless destruction of defendant's lives. . . . Increasingly, judges, prosecutors, advocates and concerned citizens have recognized that the current sentencing approach to child pornography offenders is often unfair, unreasonable, cruel, and conceptually deficient." *United States v. R.V.*, at 2019.

U.S. v. Githens, case #1:23-CR-00089-JAO     -14-
Defendant's Sentencing Memorandum

three-year period ending in 2018, there was only a 3.5% re-offense rate for child sex offenders during that same time period." *Id.* (citing Maureen F. Larson & Robert F. Schoop, *Sexual Predator Laws: Clarifying the Relationship Between Mental Health Laws and Due Process Protections, 97 Neb. L. Rev. 1167, 1169 (2019)*.

Likewise, in 2014, the Department of Justice reported that 67.8% of all released state prisoners were arrested for a new crime within three years and 76.6% were arrested within five years.[14]  However, in a longitudinal study published by the Department of Justice, only 1.4% of rapists and 3.3% of child molesters were rearrested for molesting a child after release.[15]

In *Nat'l Ass'n for Rational Sexual Offense L. v. AG Joshua Stein*, 2023 U.S. Dist. LEXIS 241047, 2023 WL 11897163 (M.DN.C Sept. 9, 2023), aff'd, 112 F.4th 196 (4th Cir. 2024). the district court qualified Dr. Keith Hersh as an expert in the areas of recidivism rates of sexual offenders, the psychology of sexual offenders offending and recidivism, and the efficacy of treatment. *Id*. at 42.  Dr. Hersh testified that "over time, there is a downward curve for sexual offense recidivism, with most recidivist committing their next sexual offense within the first three to five years of their release into the community.  *Id*.  Dr. Hersh testified "that sexual offense recidivism rate for adult sex offenders in the United States is 3% to 6% within the three-year period following their release into the community.  The rate of those who will commit a new sexual offense between years three and five decreases among those who remained offense free during the first three years.  After the five years following release into the community, the rate of recidivism continues to decrease and approaches zero over time." *Id*. at 42-43.  Dr. Hersh further testified "that at approximately year ten, the risk of a sex offender committing a sexual offense is nearly indistinguishable from that of a nonsexual offender.  He further testified that the

---

[14] Matthew R. Durose et al., Bureau of Just. Stat., U.S. Dep't of Just., *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010*, at Page 8 (2014), https://bjs.ojp.gov/content/pub/pdf/rprts05p0510.pdf.

[15] Patrick A. Langan et al., Bureau of Just. Stat., U.S. Dep't of Just., *Recidivism of Sex Offenders Released from Prison in 1994*, at Page 30-31 (2003), https://bjs.ojp.gov/content/pub/pdf/rsorp94.pdf.

U.S. v. Githens, case #1:23-CR-00089-JAO       -15-
Defendant's Sentencing Memorandum

rate of sex offenders committing any new crime is approximately 20% lower than the general recidivism rate of nonsexual offenders." *Id*. at 43. "[T]he recidivism studies relied upon by Dr. Hersh consider recidivism to consist of arrests or convictions (or both) of a subsequent sexual offense." *Id*. at 45.

Given the background of Dr. Githens (including his lack of criminal history and post arrest efforts), recidivism rates for child sex offenders, post-conviction registration requirements, and stringent supervision conditions, the likelihood of his reoffending is extremely low.

## VI. THE CHILD PORNOGRAPHY GUIDELINES NEGATE THE EFFORT TO TREAT SIMILAR CONDUCT SIMILARLY AND TO PROVIDE PROPORTIONALITY AMONG DIFFERENT GRADES OF SERIOUSNESS.

The Courts of Appeals, including the Ninth Circuit, are in alignment as concerns the child pornography guidelines not being developed in a manner "exemplifying the Sentencing Commission's exercise of its characteristic institutional role." *Henderson*, at 960 (quoting *Kimbrough*, at 109); see also *Dorvee*, at 184. As concerns the child pornography guidelines, the Chair of the Commission wrote to the House of Representatives that the proposed Congressional action would negate the Commission's carefully structured efforts to treat similar conduct similarly and provide proportionality among different grades of seriousness and would instead reintroduce sentencing disparity among similar defendants. *Dorvee*, at 185. In its report to Congress, the Commission criticized the two-level computer enhancement because it failed to distinguish serious commercial distributors from more run-of-the-mill users. *Henderson*, at 961. The Commission itself recognized that the amendments to the child pornography guidelines have made it difficult to gauge the effectiveness of any particular policy change. *Dorvee*, at 186.

The §2G2.2 sentencing enhancements routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases. *Dorvee*, at 186; *Henderson*, at 965 (an unduly deferential application of §2G2.2 will lead to the vast majority of offenders being sentenced near the maximum statutory term) (Fletcher, concurring). Many of the 2G2.2 enhancements apply in nearly all cases. *Dorvee*, at 186; *Henderson*, at 965 (enhancements for use of a computer, depictions of prepubescent minors, portrayal of sadistic or masochistic

U.S. v. Githens, case #1:23-CR-00089-JAO        -16-
Defendant's Sentencing Memorandum

conduct and the involvement of over 600 images – all of which apply in a majority of cases and some of which apply in more than 90% of them) (Fletcher, concurring).

The irrationality of §2G2.2 is easily illustrated. *Dorvee*, at 187. Had Dorvee actually engaged in sexual conduct with a minor, his Guideline range could have been substantially lower. Id. at 187. "An adult who intentionally seeks out and contacts a twelve-year-old on the internet, convinces the child to meet and to cross state lines for the meeting, and then engages in repeated sex with the child, would qualify for a total offense level of 34, resulting in a Guideline range of 151 to 188 months in prison for an offender with a criminal history category I." *Dorvee*, at 187; see also *Henderson*, at 965 (§2G2.2 often recommends longer sentences for those who receive or distribute images of minors than the applicable guidelines recommend for those who actually engage in sexual conduct with minors – such a result is particularly illogical) (Fletcher, concurring).

In *Grober*, the guideline range was 235-293 months, "the Court embarked on a careful study of how the Guidelines range urged on it by the government came to be. It took evidence over twelve days . . . and rendered . . . a forty-six page written opinion thereafter explaining in great detail how it arrived at what it believed to be the correct sentence for this defendant." *United States v. Grober*, 624 F.3d 592, 595 (3rd Cir. 2010). The 3rd Circuit affirmed the 60-month sentence. *Id*.

Grober was indicted for one count of distributing and one count of possession. *Id*. at 595. Grober was offered a plea to possession only and declined, as he had also done pre-indictment. *Id*. Two weeks before trial, after plea negotiations had broken down, a superseding indictment was returned, charging Grober with two counts of transportation of child pornography, three counts of receiving; and one count of possession. *Id*. at 596. Grober pled guilty to all counts without a plea agreement. *Id*.[16]

---

[16] Grober's offense level was 40 consisting of a base offense level of 22 with 18 levels of enhancements as follows: 2 levels for material involving prepubescent minors or minors under age twelve (USSG §2G2.2(b)(2)); 5 levels for distributing material to receive a thing of value, but not for pecuniary gain (USSG §2G2.2(b)(3)(B)); 4 levels for material portraying sadistic or

U.S. v. Githens, case #1:23-CR-00089-JAO    -17-
Defendant's Sentencing Memorandum

The district court in *Grober* expressed concern that the government's charging discretion and plea negotiations unfairly affect defendants such as Grober who do not initially plead guilty, and compared Grober to another defendant it had sentenced to thirty months imprisonment for possession of child pornography after he pled guilty without delay and pursuant to a plea agreement. *Id.* at 597. Addressing the district court's concern, the Court of Appeals stated: "[I]nsofar as the [district] Court was alarmed by the escalating offense levels implemented between the early defendant's guilty plea and Grober's guilty plea, the comparison is apt and illustrates in rather dramatic fashion why the [district] Court was concerned." *Id.* at 610.

Similar to *Grober*, the escalating offense levels in the case of Dr. Githens are alarming when compared to sentences for other defendants engaged in similar or more egregious conduct (as shown by Tables 1 and 2) and government emails regarding Dr. Githens. In a February 26, 2024, email, the government calculated the single 18 U.S.C. §2252(a)(2) charge as having a guideline range of 121-151 months. It also mentioned that if the defense prevailed on its motion to suppress, it would charge him for 18 U.S.C. §2422(b), which would have a guideline range of 108-135 months. In emails on July 24, 2025, and August 12, 2025, the government calculated the single 18 U.S.C. §2252(a)(2) charge as having a sentencing range of 210-262 months. The email also stated an interest in dropping that charge in favor of a plea deal for 18 U.S.C. §2422(b), recommending the low-end range of 168-210 months. Each of these emails listed the same enhancements. The government now appears to argue the Guideline range is 360-life.

### VII.   18 U.S.C. §3553 FACTORS

(1) *The nature and circumstances of the offense and history and characteristics of the defendant*.

There are a number of distinguishing facts in the case of Dr. Githens, as compared to nearly all of the sentences outlined in the attached comparison tables (Tables 1 and 2). Dr.

---

masochistic conduct or other depictions of violence (§2G2.2(b)(4)); 2 levels for the use of a computer (§2G2.2(b)(6)); and 5 levels for possessing more than 600 images (§2G2.2(b)(7)). *Grober* at 596.

U.S. v. Githens, case #1:23-CR-00089-JAO    -18-
Defendant's Sentencing Memorandum

Githens did not commit to meeting on a specific date and stopped responding to the OCE. [PSR ¶16]. He did not communicate with a minor or purported minor. He did not travel to a location to meet a minor. He did not threaten a minor. He did not have sexual contact with a minor, let alone an intoxicated minor who lost consciousness.[17] He does not have a prior sexual offense and has not been charged with any prior sexual offenses. Nor did he engage in production of CSAM. He has no prior criminal history. Tables 1 and 2 are a list of comparable cases. 27 of 28 cases in the tables included one or more of these elements and all received sentences between 30 days and 180 months. One case did not include one of these elements, *United States v. Furr*, case #19-cr-00033-LEK (D. Haw.) (offered to drug and livestream his 10-year-old daughter in a group chat and admitted he had done it in the past, admitted having sexual intercourse with children he babysat, and distributed CSAM – 60 month sentence).

Probation has recognized that Dr. Githens' upbring may warrant a downward variance as well may his pretrial rehabilitation. [PSR ¶140]. The government itself has acknowledged: "The defendant has taken steps toward rehabilitation so this would work in his favor." [Dkt 112 at pg. 62 of 105]. Despite his troubled background he maintains close family ties and is in regular contact with supportive family and friends.

    *(2) The need for the sentence imposed –*

        *(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*;

        The factors are well met by a 120-month sentence.

      *(B)  to afford adequate deterrence to criminal conduct.*

        Again, a 120-month sentence will provide adequate deterrence.

      *(C)  to protect the public from further crimes of the defendant.*

    Reading Dr. Githens' letter, letters in support of Dr. Githens, Dr. Howsepian's

---

[17] See attached Table 1, *U.S. v. Tibbets*, case #18-cr-00241-DAD (EDCA), in which the defendant received 180 months imprisonment, 120 months supervised release, no fine, $5,000 JVTA, and no restitution.

U.S. v. Githens, case #1:23-CR-00089-JAO          -19-
Defendant's Sentencing Memorandum

report and Dr. Githens' efforts while in custody make it clear that the public does not need protection from Dr. Githens by a sentence above the 120-month mandatory minimum.

> *(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;*

The report from Dr. Howsepian, the letters from Dr. Githens' supporters, show clearly, he is no longer in need of any further vocation or correctional treatment.  He is eager to continue his rehabilitation.  The PSR recommended (9-12 month program) and the Sexual Offender Treatment Program (SOTP) (9-12 months) within BOP, while recommending mental health treatment and sexual offender therapy upon release.  This recommendation reflects the widely-publicized chronic staffing crisis in BOP which makes it highly unlikely that meaningful treatment can be provided by the BOP beyond the 18-24 months of RDAP and SOTP.

(3) *The kinds of sentences available*;

A sentence of 120 months, with a 10-year term of supervised release, is an available sentence and the one that best conforms with the law and the purposes of sentencing.

(4) *The kinds of sentence and the sentencing range established for –*

> (A) *the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –*

The Guideline range here is inappropriately high even in a "normal" case, but the circumstances under which Dr. Githens committed the offense, his pre-offense history, and his post-offense rehabilitation compel a finding that the range is simply too high.  As noted by the Ninth Circuit, district courts need not defer to §2G2.2.  *Henderson*, at 960.  The Second Circuit deemed §2G2.2 "irrational[]" and found it to be "fundamentally incompatible with §3553(a)" because, by pushing all child pornography offenders towards the maximum term, it "eviscerates the fundamental statutory requirement in §3553(a) that district courts consider the nature and circumstances of the offense and the history and characteristics of the defendant." *Dorvee*, at 187;  see also *Grober*, 624 F.3d 592 (3rd Cir. 2010); and *United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009) ("[W]e wish to express our view that [§2G2.2 is] in our judgement harsher than

U.S. v. Githens, case #1:23-CR-00089-JAO          -20-
Defendant's Sentencing Memorandum

necessary . . . [F]irst-offender sentences of this duration are usually reserved for crimes of violence and the like.").

The defense notes that grounds exist to critically review the guideline range based upon factors the Commission recognized in its 2012 and 2021 reports.  A variance is warranted to ameliorate the effect of guidelines §2G2.2(b)(2), (b)(4), (b)(6), and (b)(7), which do not meaningfully distinguish one non-production defendant from another.  These enhancements occur in nearly all child pornography cases, where they are deemed to be "specific offense characteristics" that aggravate the base offense level.  They require a 13-level increase in offense level.  The stated purpose of "specific offense characteristic" enhancements is to distinguish a particular defendant's crime.  United States Sentencing Commission studies support the notion that the enhancements are outdated for truly distinguishing the worst cases from others.

In June 2021, the United States Sentencing Commission issued a report[18] entitled "Federal Sentencing of Child Pornography:  Non-Production Offenses," which updated a similar report the Commission published in 2012.  In the *2012 Report*, the Commission recognized that "[t]he current sentencing scheme in 2G2.2 places disproportionate emphasis on outmoded measures of culpability regarding offenders' collections" and that "[a]s a result, the current sentencing scheme results in overly severe guideline ranges for some offenders."  *2012 Report* at pg. 321.[19] The Sentencing commission concluded that it is not reasonable to enhance the penalty for a crime beyond what is typical for a "specific offense characteristic" that is present in every case, or in most cases.  *2021 Report* at pg. 2, 18, and 53. The *2021 Report* states:  "The changes in computer and internet technology typically used by non-production child pornography offenders [have] rendered the sentencing scheme insufficient to distinguish between offenders

---

[18] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf

[19] https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

U.S. v. Githens, case #1:23-CR-00089-JAO    -21-
Defendant's Sentencing Memorandum

with different degrees of culpability." *Id*. at pg. 1 (footnote omitted).  Regarding these common 13 levels of enhancements, the Commission in 2021 reported:

> The 2012 Child Pornography Report explained that by fiscal year 2010, four of the six enhancements in §2G2.2(b) – together accounting for 13 offense levels - applied to the typical non-production child pornography offender and thus failed to meaningfully distinguish between more culpable and less culpable offenders.  In fiscal year 2019, these enhancements each continued to apply in the vast majority of non-production child pornography cases.  Notably, over 95 percent of non-production child pornography offenders received enhancements for use of a computer and for the age of the victim (images depicting victims under the age of 12).  The enhancements for images depicting sadistic or masochistic conduct or abuse of an infant or toddler (84% of cases) or having 600 or more images (77.2% of cases) were also applied in most cases. . . .
> Thus, across all non-production child pornography offense types, 2G2.2 fails to distinguish adequately between more and less severe offenders.  *2021 Report* at pp. 18-19 (footnotes omitted).

With respect to the "specific offense characteristics" that drive these sentences skyward, the Commission found that characteristics scored here in our case apply in nearly all cases, thus failing to distinguish one non-production child pornography offender from another.

(5) *Any pertinent policy statement – (A) issued by the Sentencing Commission*.

There are no policy statements which deter a 120-month sentence.

(6) *The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct*.

The Commission's 2021 report found that across the federal judicial system, 56.8% of possession cases involved distribution by the defendant and 21.1% of receipt cases involved distribution by the defendant.  *2021 Report* at pg. 51.  Additionally, across the federal system, 73.6% of non-production distribution offenders received a downward departure or variance.  *Id*. at pg. 23.

Numerous cases, brought before the district court and Ninth Circuit, involving more serious behavior, resulted in substantially lower sentences than the Guideline range calculated for Dr. Githens.  Attached are comparison Tables 1 and 2, that in addition to case of *United States v. Haider*, reference Eastern District of California and the District of Hawaii cases similar

U.S. v. Githens, case #1:23-CR-00089-JAO    -22-
Defendant's Sentencing Memorandum

to Dr. Githens, outlining the conduct involved in the cases, charges, offense of conviction, and sentences.

Even the minimum sentence will be a substantial punishment on Dr. Githens.  He is ineligible for First Step Act credits (up to a 66% reduction) because of his §2252(a)(2) conviction, will spend nearly a decade hundreds of miles from loved ones, will be under the strict control of a U.S. Probation Officer for years, will likely never work in a university again, will spend the rest of his life with the extreme stigma of being a convicted felon and registered sex offender.  Regardless of the decision of the Court, Dr. Githens will receive a lifetime of punishment for his actions.

Other examples include the Ninth Circuit cases of *United States v. Boudreau*, 154 F.4th 1132 (2025) and *United States v. Macapagal*, 56 F.4th 742 (2022).  Cases in which each defendant showed up at a designated meet and was convicted following a jury trial – in the case of *Macapagal*, he testified at trial.

In *United States v. Boudreau*, 154 F.4th 1132 (2025), after filing a motion to suppress, motion to sever the two charges, and motion in limine to exclude evidence and a jury finding the defendant guilty of violating 18 U.S.C. §2422(b) and 18 U.S.C. §2252A(a)(5)(B), the district court sentenced Boudreau to 154 months.  Boudreau contacted a fictious minor (Mia) he believed was a 12-year-old girl, texted Mia extensively, at various points expressed a sexual interest in Mia, traveled from his home in Anaconda, Montana, to Missoula (approximately 106 miles) intending to meet and have sex with Mia, and was arrested at the designated meeting location.  Evidence showed that the same summer Boudreau communicated with Mia, he pursued a relationship with a 17-year-old girl named Hope and a protective order was entered against him.  At trial, Hope testified that she began "hanging out with" Boudreau, exchanged text messages with him, was intimate with him "once or twice," and that he asked her for nude pictures.

In *United States v. Macapagal*, 56 F.4th 742 (2022), the defendant was convicted following a jury trial of violating 18 U.S.C. §2422(b).  In *Macapagal*, an FBI agent posed as

U.S. v. Githens, case #1:23-CR-00089-JAO    -23-
Defendant's Sentencing Memorandum

"Kay," the mother of three minor daughters, ages 6, 9, and 11. Macapagal told Kay he was interested in having sex with the minors, sent photographs of his nude torso and asked Kay to share the photograph with one of the girls, scheduled a meeting to meet the girls, and showed up for the meeting with gift bags, condoms, and vibrators. At trial, Macapagal testified that he never intended to participate in sexual activity with the children. He was sentenced to 121 months and 10 years of supervised release.

(7) *The need to provide restitution for any victims of the offense.*

Dr. Githens has agreed to provide a substantial payment of $75,000 to satisfy all financial obligations – forfeiture, restitution, special assessments, and any fine - more than the defendant in any case in the comparison tables (attached Tables 1 and 2) paid in restitution, fines, special assessments, and forfeiture.

## VIII.  CONCLUSION

The §3553 factors, when applied to Dr. Githens' matter, compel the Court to sentence him to a term of 120 months.

Dated: July 17, 2026                         Respectfully submitted,

                                             */s/ Marc Days*
                                             MARC DAYS
                                             Attorney for Defendant
                                             Rodger Githens

**TABLE 1 — Comparable Sentences in the Eastern District of California**

| Case / No. | Charges | Counts of Conviction | Sentence | Summary of Conduct |
|---|---|---|---|---|
| **U. S. v. Montane-Darab** No. 11-CR-00538-KJM | § 1470 § 2252(a)(2) § 2422(b) | § 1470 | **30 days** Fine: Waived Restitution: N/A | • Sent two images of his erect penis to a 13-year-old, knowing her age, and exchanged sexually explicit images with a 15-year-old whose true age appeared on her profile. [ECF 19]. • Arranged to meet the 15-year-old for sex but cancelled beforehand. [ECF 19]. • 24 years old at sentencing; the PSR recommended 15 months. [ECF 30]. |
| **U. S. v. Anger** No. 24-CR-00316-DAD | § 2252(a)(2) (3 counts) | § 2252(a)(2) | **60 months** SR: 10 years Fine: $0 AVAA: $0 JVTA: $10,000 Restitution: $5,000 | • Pursued investigation based on two leads. • Received and distributed CSAM of numerous videos and images including children under seven. [ECF 5]. • Conduct reflected a roughly decade-long pattern surfacing across multiple federal investigations before charges were brought. [ECF 5]. • First caught the attention of HSI in 2012 based on a cybertip, and while not charged at that time, Anger asserted he had "put things behind him" and would not reoffend. [PSR ¶¶54-58]. • Guideline range was 70–87 months; the court varied downward to the 60-month statutory mandatory minimum. [ECF 20; 23]. |
| **U. S. v. Wood** No. 14-CR-00144-MCE | § 2422(b) § 2252(a)(2)(A) § 2252A(a)(2) § 2252(b)(1) | § 2252(a)(2)(A) | **60 months** SR: 10 years Fine: $0 Restitution: $0 | • Arrived at a sting meeting carrying an eight-inch vibrator, lubricant, and condoms, and admitted requesting nude genital images from the purported 14-year-old. [ECF 1]. • Admitted to online conversations with at least three other minors. [ECF 1] |
| **U. S. v. Martinez** No. 13-cr-00436-LJO-SKO | § 2422(b) § 2423(b) | § 2423(b) | **97 months** SR: 15 years Fine: $0 Restitution: $7,628.26 | • Traveled from Reno, Nevada, to Fresno, California, to engage in sexual contact with a minor. [ECF 13]. • PSR interview revealed "his lack of remorse for his crime, and his continued callous indifference to the well-being of the extremely troubled victim." [ECF 21]. |
| **U. S. v. Lowe** No. 12-CR-00297-KJM | § 2252(a)(2) § 2422(b) | § 2422(b) | **120 months** SR: 10 years Fine: $0 Restitution: $0 | • Attempted to entice a purported 13-year-old and a friend to meet for sexual activity, describing intended acts in degrading terms including her having sex with dogs. [ECF 1]. • Stated a preference for girls around age 9. [ECF 1]. • Asked the purported minor to invite friends that were younger than her. [ECF 1]. |

| Case / No. | Charges | Counts of Conviction | Sentence | Summary of Conduct |
|---|---|---|---|---|
| | | | | • Admitted repeatedly molesting a young child he babysat—including removing her diaper and masturbating while touching her—and exposing himself to her on roughly a dozen occasions. [ECF 1].<br>• Admitted to ongoing sexual communication with another minor. [ECF 1].<br>• Admitted receipt and distribution of CSAM. [ECF 1]. |
| U. S. v. Mozingo<br>No. 25-cr-00115-DJC | § 2422(b) | § 2422(b) | **120 months**<br>SR: 15 years<br>Fine: $0<br>Restitution: $31,000.00 | • Contacted an undercover Tinder profile and continued the conversation after being explicitly told that "Emily" was 13 years old. [ECF 1].<br>• Described sexual acts he intended to perform, sent two images of his penis, requested sexually explicit photographs and videos, and asked to record their anticipated sexual encounter. He also claimed to have previously had sex with a 15-year-old and discussed keeping the relationship secret until "Emily" turned 18. [ECF 1].<br>• Traveled from the Sacramento area to a prearranged meeting location in Brentwood, approximately 70 miles, where he was arrested. [ECF 1].<br>• After receiving Miranda warnings, admitted that he planned to have sex with "Emily," believed she was underage, and intended to record the sexual activity. [ECF 1].<br>• A forensic search of his phone identified a Telegram video depicting a prepubescent girl performing oral sex on an adult male; the video had been distributed to another user in February 2025. [ECF 1].<br>• Criminal history category of III. [ECF 40]. |
| U. S. v. Peralta<br>No. 20-CR-00166-ADA-BAM | § 1470<br>§ 2252(a)(2)<br>§ 2422(b) | § 2422(b) | **120 months**<br>SR: 20 years<br>Fine: $0<br>AVAA: $0<br>JVTA: $0<br>Restitution: $0 | • Solicited images from a purported 13-year-old, sent two images of an erect penis, described sexual acts he wished to perform, and CSAM he wished to produce with her. [ECF 1].<br>• Traveled to Fresno and arrived at the arranged meeting location. He admitted possessing roughly 50 to 60 CSAM files depicting children aged 5 to 9 engaged in oral sex and intercourse. [ECF 1].<br>• Stated during interrogation that he had engaged in similar enticement conduct before. [ECF 1]. |
| U. S. v. Perry<br>No. 12-CR-00238-TLN | § 2252(a)(2)<br>§ 2252(a)(4)(B)<br>§ 2422(b) | § 2422(b) | **120 months**<br>SR: Life<br>Fine: $0<br>Restitution: $0 | • Transmitted CSAM—including images of prepubescent boys engaged in sexual contact—to another offender whose account agents had assumed. [ECF 1].<br>• Expressed a sexual interest in a purported nine-year-old. [ECF 1]. |

| Case / No. | Charges | Counts of Conviction | Sentence | Summary of Conduct |
|---|---|---|---|---|
| | | | | • Arrived at the arranged hotel meeting carrying condoms. [ECF 1]. |
| **U. S. v. Tudor** No. 18-CR-00223-DAD-BAM | § 2422(b) § 2252(a)(2) (4 cts.) | § 2422(b) | **120 months** SR: 15 years Fine: $0 Restitution: $0 | • Attempted to entice a 13-year-old in South Carolina to engage in sexual activity. [ECF 1]. • As part of the plea, the government dismissed four counts of CSAM receipt and a pending District of Montana indictment. [ECF 20]. |
| **U. S. v. Garrett** No. 10-CR-00213-TLN | § 2252(a)(4)(B) § 2252(a)(2) § 2251(a) § 2422(b) | § 2422(b) | **132 months** *Type-C plea* SR: 15 years Fine: $0 Restitution: $35,000 | • Posed as a minor across multiple social-media profiles and admitted inappropriate online contact with several juvenile females. [ECF 1]. • Carried out a prolonged sextortion of a Wisconsin victim beginning at age 12, pressuring her into increasingly explicit photographs and live video and threatening to publish nude images of her if she refused. [ECF 1]. • Possessed CSAM. [ECF 1]. • Solicited nude images from a minor relative. [ECF 1]. |
| **U. S. v. Johnston** No. 12-CR-00238-TLN | § 2252(a)(2) § 2252(a)(4)(B) § 2422(b) (+ Calif. charge) | § 2422(b) (+ Calif. charge) | **144 months** *Type-C plea* SR: 20 years Fine: $50 Restitution: $0 | • Described prior relationships with boys under 14, expressed interest in a purported 9-year-old, and discussed sexual acts. [ECF 1]. • Arrived at the hotel meeting, admitted a romantic relationship with a 14-year-old boy, and admitted trading CSAM of boys aged 9 to 15. [ECF 1]. • Federal term ran concurrently with a state sodomy-of-a-minor sentence. [ECF 101]. |
| **U. S. v. Hume** No. 13-CR-00076-AWI-BAM | § 2252(a)(2) § 2422(b) | § 2252(a)(2) | **151 months** SR: 15 years Fine: $0 Restitution: $0 | • Had repeated sexual encounters with a 13-year-old boy and continued contacting the boy until his arrest. [ECF 1]. • Possessed an image of the boy's genitalia. [ECF 1]. • Admitted using file-sharing software to download more than 600 CSAM files, including prepubescent and sado-masochistic material. [ECF 1]. • Stated he was interested in boys aged 5 to 17, claimed to have had sex with an 8-year-old in Mexico, and said he was planning a trip to Thailand. [ECF 1]. |
| **U. S. v. Binford** No. 20-CR-00150-DAD-BAM | § 2252(a)(2) § 2422(b) | § 2252(a)(2) | **180 months** SR: 10 years JVTA: 5,000 Fine: $0 | • Operated under the screenname "Teachyou559" and traveled to a sting location to have sex with a purported 13-year-old. [ECF 1]. • CSAM collection comprised 594 images depicting victims from six months to fifteen years old, video of infant screaming in pain while being vaginally penetrated with an object. [ECF 1]. |

| Case / No. | Charges | Counts of Conviction | Sentence | Summary of Conduct |
|---|---|---|---|---|
| | | | | • Had prior state convictions for lewd or lascivious acts with a child under 14 and for failure to register. [ECF 1].<br>• Received mandatory minimum for someone with a prior offense. [ECF 88]. |
| **U. S. v. Tibbets**<br>No. 18-CR-00241-DAD-BAM | § 2252(a)(2)<br>§ 2252(a)(4)(B)<br>§ 2423(b)<br>§ 2422(b) (2 cts.)<br>§ 2251(a) | § 2251(a) | **180 months**<br>SR: 10 years<br>Fine: $0<br>JVTA: $5,000<br>Restitution: $0 | • Cultivated the first victim online under a false age beginning when she was 14, ultimately receiving hundreds of sexual images, meeting her in person roughly ten times for sexual contact. [ECF 1].<br>• Later posted her nude images online in retaliation. [ECF 1].<br>• One of the victims alleged he posted CSAM images of her online as retribution for her blocking him on social media. [ECF 1].<br>• Had repeated intercourse with a second victim while she was a minor, including once after she lost consciousness from intoxication. [ECF 1].<br>• Moved from Washington to Fresno to be closer to the victim and had sex with her at least seven times. [ECF 1].<br>• Admitted possessing additional CSAM of minor females. [ECF 1]. |

**TABLE 2 — Comparable Sentences in the District of Hawaii**

| Case / No. | Charges | Counts of Conviction | Sentence | Summary of Conduct |
|---|---|---|---|---|
| **U. S. v. De Ziel**<br>No. 21-CR-00002-LEK-1 | § 2422(b)<br>§ 2252A(a)(5)(B)<br>§ 2252A(b)(2) | §<br>2252A(a)(5)(B)<br>§ 2252A(b)(2) | **18 months**<br>SR: 10 years<br>Fine: $0<br>Restitution: $0 | • Responded to an undercover officer posing as a 13-year-old girl and sent sexually explicit messages; after the officer stated she was now 14, continued with sexually explicit messages proposing that she live with him, expressing intent to have sexual intercourse with her, inviting her to run away with him, and offering to pick her up. [ECF 1].<br>• The undercover officer acting as the minor said she would be visiting Hawai'i, and discussed ensuring her family would not learn of any meeting; arranged to meet in person, and appeared. [ECF 1].<br>• CSAM recovered depicting young girls, including one victim approximately seven years old. [ECF 1].<br>• Plea included an admission that he knew the purported minor was 13 years old. [ECF 40]. |
| **U. S. v. Furr**<br>No. 19-CR-00033-LEK | §<br>2252A(a)(2)(A) | §<br>2252A(a)(2)(A) | **60 months**<br>SR: 10 years<br>Fine: $0<br>AVAA: $3,000<br>Restitution: $0 | • Participated in a chatroom titled "Littles any age for Daddy" and posted CSAM and non-CSAM imagery of minors, including video of a child he identified as his daughter. [ECF 1].<br>• Offered to drug his 10-year-old daughter and live-stream activity with her for other users and admitted to having done this in the past. [ECF 1].<br>• Posted CSAM depicting children as young as eight. [ECF 1].<br>• In sexting messages, he admitted to having sexual intercourse with children he babysat. [ECF 1]. |
| **U. S. v. Lyles**<br>No. 19-CR-00075-JMS | §<br>2252A(a)(2)(A)<br>§ 2252A(b)(1) | §<br>2252A(a)(2)(A)<br>§ 2252A(b)(1) | **60 months**<br>SR: 10 years<br>Fine: $0<br>Restitution: $0 | • A production case in which the government agreed not to charge a count carrying a 15-year mandatory minimum per count. [ECF 8].<br>• Posing as a teenage boy across several accounts, he solicited CSAM from at least 11 girls he knew to be 13 to 17, causing production of at least 89 images and 5 videos and sending the victims dozens of images of his penis. [ECF 8]. |
| **U. S. v. Lim**<br>No. 22-CR-00015-JAO-1 | § 2252A(a)(1) | § 2252A(a)(1) | **90 months**<br>SR: 15 years<br>AVAA: $3,000 | • CSAM-production case referred by HSI Tokyo after a 9-year-old sent nude images to someone in the U. S. [ECF 1].<br>• Requested to see the 9-year-old's genitalia, asked her to masturbate, and repeatedly called her a "bitch" while giving sexualized instructions as part of the CSAM production. [ECF 1].<br>• Agents found thousands of CSAM images and videos, including vaginal and anal rape of toddlers. [ECF 1]. |

| Case / No. | Charges | Counts of Conviction | Sentence | Summary of Conduct |
|---|---|---|---|---|
| | | | | • Arrested in Japan in 2016 for similar conduct involving more than 100 females ages 10 to 12 between 2014 and 2016. [ECF 1].<br>• Plea included an agreement not to file additional charges beyond § 2252A(a)(1). [ECF 55]. |
| U. S. v. Cowley<br>No. 19-CR-00041-JMS | § 2422(b) | § 2422(b) | **120 months**<br>SR: Life<br>Fine: $0<br>JVTA: $5,000<br>Restitution: $0 | • Responded to an undercover advertisement offering "girls to share" in a purported family arrangement, expressing interest in children aged 6, 9, and 13 and stating he wanted "the 6 first." [ECF 1].<br>• Traveled to the arranged location bringing a toy doll, a slurpee, nail polish, and condoms. [ECF 1]. |
| U. S. v. Fredrickson<br>No. 20-CR-00042-HG | § 2422(b)<br>§ 1470 | § 2422(b) | **120 months**<br>*Type-C plea*<br>SR: 10 years<br>Fine: $0<br>JVTA: $5,000<br>Restitution: $0 | • Expressed immediate interest in meeting a purported 13-year-old for sex and sent an image of an erect penis. [ECF 1].<br>• Texted simultaneously with a second undercover posing as a 13-year-old's mother. [ECF 1].<br>• Negotiated paid sex with the child and arranged to meet, driving to the location before leaving to confirm the contact was not law enforcement. [ECF 1]. |
| U. S. v. Gaston<br>No. 24-CR-0008-LEK | § 2422(b) (+ Calif. charge) | § 2422(b)<br>(+ Calif. state) | **120 months**<br>SR: 5 years<br>Fine: $0<br>JVTA: $5,000<br>Restitution: $0 | • Responded to an undercover Grindr profile referencing "taboo" and "no limits" and discussed sexual contact with purported 9- and 11-year-old children during a planned visit, including touching their genitalia and oral sex. [ECF 1].<br>• Arrived at agreed upon meeting location to pursue sex with the purported children. [ECF 1].<br>• In a chat with an undercover officer, Gaston claimed that "[a] time or two I may have played with someone 16 [years old]. [ECF 1].<br>• Federal sentence ran concurrent with a California state sentence. [ECF 39]. |
| U. S. v. Goeas<br>No. 19-CR-00042-JAO | § 2422(b) | § 2422(b) | **120 months**<br>*Type-C plea*<br>SR: 15 years<br>Fine: $0<br>JVTA: $5,000<br>Restitution: $0 | • In a sting, initiated a meeting with a purported 13-year-old, discussed sexual acts, and arrived carrying condoms and lubricant. [ECF 1].<br>• Plea included an agreement that no further charges for enticement or contact with minors would be brought. [ECF 34]. |
| U. S. v. Kirk<br>No. 19-CR-00154-JMS | § 2422(b)<br>§ 1470 | § 2422(b) | **120 months**<br>SR: 15 years<br>Fine: $0<br>JVTA: $5,000 | • Responded to an undercover profile referencing daughters aged 6, 9, and 11, expressed interest in all three. [ECF 1]. |

| Case / No. | Charges | Counts of Conviction | Sentence | Summary of Conduct |
|---|---|---|---|---|
| | | | Restitution: $0 | • Described a plan to penetrate the 6-year-old, sent an image of an erect penis, and inquired if the 11-year-old daughter would be interested. [ECF 1].<br>• Traveled to and arrived at the meeting location. [ECF 1]. |
| U. S. v. Saffeels<br>No. 22-CR-00026-LEK-1 | § 2422(b) | § 2422(b) | **120 months**<br>(+ Hawai'i charge)<br>SR: 15 years<br>Fine: $0<br>Restitution: $0 | • An undercover officer posted an unspecified solicitation and posed as a 13-year-old; Saffeels asked for a "sexy pic" and offered money for a nude photograph or sex. [ECF 1].<br>• Requested an in-person meeting for sex and appeared at the meeting location. [ECF 1].<br>• Federal sentence runs concurrently with his sentence in a State of Hawai'i case. [ECF 29]. |
| U. S. v. Willing<br>No. 25-cr-00040-SASP | § 2252(a)(2)<br>§ 2252(b)(2)<br>§ 2252A(a)(5)(B)<br>§ 2252A(b)(1) | §<br>2252A(a)(5)(B)<br>§ 2252A(b)(1) | **120 months**<br>SR: Life<br>Fine: $0<br>Restitution: $0 | • CSAM included images and videos of minors as young as two years old; these 1+ hour videos included graphic depictions of vaginal penetration. [ECF 1].<br>• Convicted in a State case with multiple charges and counts for sexual crimes, including a crime against a minor child. [ECF 11].<br>• Confessed to sexually assaulting a minor when she was seven years old. [ECF 1]. |
| U. S. v. Macapagal<br>No 19-CR-00080-LEK | § 2422(b) | § 2422(b) | **121 months**<br>SR: 10 years<br>Fine: $5,000<br>JVTA: $5,000 | • Responded to an undercover dating-app profile requesting "taboo" activity and engaged in sexually suggestive discussions concerning the undercover officer's purported children, ages 6, 9, and 11. [ECF 3].<br>• When asked about his prior sexual experience with children, declined to identify ages because the information could be "indicting" and asserted that such encounters could be consensual and mutually beneficial. [ECF 3].<br>• Discussed methods for introducing the purported children to sexual contact, including having sex with the undercover officer first and showering together to make the children more comfortable with what he called "special touches." [ECF 3].<br>• Expressed excitement about the plan, arranged an in-person meeting, and traveled to the designated location in Hawai'i. [ECF 3].<br>• Arrived carrying condoms and lubricant as requested; officers also found small vibrators on his person or in his vehicle. [ECF 3].<br>• Found guilty in jury trial. [ECF 124]. |
| U. S. v. Both-Maagnisi<br>No. 21-CR-00047-SOM | § 2422(b) | § 2422(b) | **132 months**<br>SR: 5 years | • Arrived at the arranged location to engage in sex with a purported minor. [ECF 6]. |

| Case / No. | Charges | Counts of Conviction | Sentence | Summary of Conduct |
|---|---|---|---|---|
| | § 2252A(a)(5)(B) | § 2252A(a)(5)(B) | Fine: $0<br>JVTA: $10,000<br>Restitution: $6,000 | • After his arrest, a tip led to discovery of 93 CSAM videos and 224 CSAM images, some depicting children under 12 and sado-masochistic bondage. [ECF 6]. |
| U. S. v. Caulk<br>No. 25-CR-00071-JMS | §§ 225l(a) and 225l(e)<br>§ 2252A(a)(5)(B) | §§ 225 1 (a) and 2251(e) | 180 months<br>SR: 10 years<br>Fine: $0<br>Restitution: $0 | • Used multiple Instagram accounts to contact minor girls, solicit sexually explicit images, and conceal his identity; messaged multiple minors ages 14 to 16 after learning their ages. [ECF 1].<br>• Sextorted one minor by threatening to distribute her nude images to her followers. The threats caused the victim to state that exposure would ruin her life and that she would kill herself. [ECF 1].<br>• Posing as a 15-year-old, induced a 14-year-old victim to send a nude image, secretly captured a screenshot, and threatened to distribute it to her friends, family, and school unless she performed sexual acts on camera. [ECF 1].<br>• Also admitted requesting and receiving explicit photographs from a 14-year-old girl in the Philippines and acknowledged that CSAM would be found on his cellphone. [ECF 1]. |